May it please the court. My name is Asher Steinberg. I'm an Assistant Solicitor General with the Arkansas Attorney General's Office. With me at council table is Assistant Attorney General Rachel Kemp, and we represent the Director of the Arkansas Division of Corrections in these matters, Jimerson and Brown. Twenty-seven years ago, Tina Jimerson, John Brown, and Reginald Early were convicted of rape and then left in the trunk of her car. In part, though by no means entirely, that conviction rested on the confession and guilty plea of the fourth co-defendant, Charlie Vaughn, who implicated Brown and the two, and Jimerson and Early. Over twenty years after that conviction, Brown and Jimerson filed petitions for writ of habeas corpus. Those petitions rested on the claim that if only the jury had known that their co-defendant, Charlie Vaughn, had previously confessed in prison to an informant, they likely would have been acquitted. The district court inexplicably, in our view, granted relief on those claims, and Jimerson and Brown have been released. We're asking this court to reverse so they can be sent back to prison. I'd like to begin with supplemental briefing issues. If the court doesn't have any questions on waiver of exhaustion, I'll proceed to whether Brown and Jimerson were required to exhaust their quorum nobis remedy. Well, why wasn't there a waiver? There was not a waiver because the director asserted the defense of procedural default predicated on the premise, the allegation, which is undisputed, that both Brown and Jimerson did not exhaust, as a matter of fact, any state court remedy. Now, the director took the position that these remedies were technically exhausted because they were no longer available. The statement was pretty clear and unequivocal, that there were no other things available to them that they could pursue. In the supplemental briefing, I didn't see where the state argued that this was inadvertent or something. They weren't aware of an exhaustion requirement. No, I don't think our position is that the statement was inadvertent, but rather the position below and continues to be. Then why isn't it a waiver? Because the position is that quorum nobis is no longer an available remedy, but should the court reject that and hold that quorum nobis still remains available to Brown and Jimerson, we don't think that necessarily... Is the state's position that quorum nobis wasn't available? The state's position was that quorum nobis was not available at the time these habeas petitions were filed because of the lack of diligence in seeking quorum nobis for two decades after the convictions. But should the court hold that quorum nobis still remains available, that the Arkansas Supreme Court would not hold that it's unavailable and that there is diligence here, we don't think that that waived the lesser defense of exhaustion when we in fact asserted a defense of procedural default predicated on the complete failure to exhaust any remedy. But I would add that if you do see that as a waiver, I think that under your decision in Victor, the Hopkins, that's a waiver that you cannot accept because we raised the defense of procedural default, again, predicated on the failure to exhaust any remedy in the state court. And while my friend has suggested that Wood v. Milliard impliedly abrogated or overruled Victor, I think that's wrong for a couple of reasons. One, Wood doesn't speak to exhaustion, it's only about a waiver of the statute of limitations. And second, Wood is not dealing with the kind of waiver that took place in Victor, which this court said was an inconsistent and ineffective waiver because the state, as we did here, was simultaneously asserting the defense of procedural default based on the failure to exhaust state court remedies. Turning then to whether, assuming we haven't waived that defense, Brown and Jimerson were required to exhaust Coram Nobis, we think the answer is yes. Now, I've heard several arguments on the other side about why the answer is no. One, the remedy is generally described in Arkansas case law as extraordinary. Two, the standard for Brady they claim is different in Arkansas. And third, the entire Arkansas Supreme Court would be required to Brown and Jimerson. So we think all of those are wrong. First taking up the matter of extraordinariness, we certainly agree that if this were the case, if this case presented claims that were outside the four categories that the Arkansas Supreme Court has held Coram Nobis is available for, then the remedy would be extraordinary, it would be speculative whether the Arkansas Supreme Court would extend it to that new kind of claim, and it would be outside the ordinary course. However, the Arkansas Supreme Court for decades now has consistently held that Coram Nobis is, quote, available for material evidence withheld by the prosecutor, which we think is a class of claims that includes young blood, though I'm going to turn to that later when I get to Rhines. But it's very clearly available for Brady. There obviously have been a number of grants of relief, a larger number of reinvestitures of jurisdiction and circuit courts to entertain Brady claims, so it's certainly at least available for Brady, and they were required to exhaust it for that claim at least. Now, second, the argument has been made that Arkansas uses a different standard for Brady and Coram Nobis. We don't think that's right. The Arkansas Coram Nobis cases say it's true that Coram Nobis requires an error of a kind that would, had it been known at the time of trial, prevent a rendition of the judgment, and they say that's a higher bar than the Brady materiality standard, which only requires a reasonable probability of a different outcome. But as we read the Arkansas Coram Nobis cases, they say that, as it were, at the top, when they're deciding what kinds of claims will be entertained in Coram Nobis, they've held, rightly or wrongly, I suppose, that Brady is such a sort of claim, and then, as we read these cases, they apply the Brady standard in a perfectly orthodox way and instruct circuit courts to grant Coram Nobis relief if all the traditional elements as described in federal law are satisfied. So how are we to know which standard they would apply? Which one are we to go with, the one that you've described at the top of the page or the one that ends it in granting the instructions that they give to circuit courts on remand? I think we either quoted Newman or Howard in our supplemental brief in this respect, where they specifically instruct a circuit judge, you do Brady element one, Brady element two, Brady element three. If you find all of those, you are to grant a new trial. And this statement about preventing the rendition of judgment is just a generality about the kinds of claims that will be entertained in Coram Nobis, not an overlay that you're supposed to apply over all four of those classes of claims. And I would add that they haven't pointed to a single case where the Arkansas Supreme Court has ever held, well, you satisfied the elements of your Brady claim, but you failed to chin this higher bar, therefore you lose. And we've looked, and we don't think any such case exists. Now, I would just add that if you think there's any uncertainty about that, we don't think it's actually correct that a remedy is unavailable because a state court has said that it's applying a different standard from federal law. That could just, in a particular case, result in a contrary to adjudication, and then it would get no deference under AEDPA. But it can't be right that if a state court has announced at some point that it's applying a different standard from federal law, you then toss out the remedies they're providing, say you don't have to exhaust them even if they're direct appeals or whatever, because they're not following federal law. Rather, you look at a particular adjudication, you see whether there was a contrary to adjudication there, and that controls deference. But I don't think it's ever been held that it controls whether you have to exhaust. Now, third, they talk about recusal, the alleged necessity that the entire Arkansas Supreme Court would have to recuse. I don't know that we have a position on that today. We certainly agree that Justice Wynn would have to recuse, and he in fact has from original early state habeas petitions. But in any event, if it were the case that the entire court decided that it should recuse, the governor routinely appoints special justices in some matters. He's appointed a full complement of special justices when there's a matter that goes to the court conflicts with them. And so we don't understand how that would render this remedy unavailable. Then, on the question of Rines, and I don't believe that Brown has requested a Rines stay from this court, so I'll just address Jimerson's arguments on Rines. So she says it's a mixed petition. We don't think, with the possible exception of the actual innocence claim, that it satisfies that threshold condition for a Rines stay. As we understand Arkansas' Quorum Novus cases, they haven't just said Brady is adjudicable in Quorum Novus. Rather, they say there's a category of claims, material evidence withheld by the prosecutor. And this court in fact has held that young blood claims require a showing of substantial prejudice. It's used the word materiality to describe those claims. So we don't think that it's true that young blood claims are not cognizable in Arkansas' Quorum Novus. They have cited one case that they suggest shows that, a case named Buckley, where there was a destroyed videotape and no relief was granted. But Mr. Buckley was in fact raising a Brady claim in that case. He did not allege the tape had been destroyed. And in fact, later it was found and I believe that relief was granted on the basis of the retrieved videotape. So, taking actual innocence aside, which I think we would acknowledge is not adjudicable in Quorum Novus, but we don't think can be the tail that wags the dog here such that you say that this is a mixed petition because there's a freestanding actual innocence claim. We view it as an unmixed petition. Now, if you disagree about that, we still don't see that there's good cause for the failure to exhaust at least the Brady claim in Quorum Novus. It seems abundantly clear to us that Quorum Novus was an available remedy if she were timely to present the Brady claim. And we can't see what could be the good cause for a delay, not only of 23 years after conviction, but then four years after conviction. After the habeas petition was filed, whether or not Arkansas would deem the Quorum Novus petition timely, as a matter of federal law, we don't think there's good cause for the failure to exhaust Quorum Novus. And finally, on the matter of rinds, while the court can reverse for non-exhaustion, it cannot, we think, order a rind stay without first considering the state's timeliness defense and deciding whether or not we have a timely petition here at all. If I could then turn to the matter of timeliness in Jimerson, we think that this is an abundantly clear-cut case of untimeliness. We're not dealing, really, with a question of diligence here. We simply have factual predicates of all Jimerson's claims that were discovered 17 months before she filed her habeas petition. So if I could walk through those factual predicates. In January 2014, an agent for Jimerson's lawyers, Mr. Stimas, former Secret Service agent, talks to a sheriff in Fordyce, Arkansas. He discovers that an informant was used. He discovers, according to the district court below, that the informant was incentivized to get information from Mr. Vaughn. He discovers that the recording of this conversation was destroyed, that there was a confession made to the informant. He further discovers... Did he discover it was destroyed? That information? Sorry, I think I misspoke. He did discover, the district court said, that the recording no longer existed. I don't think that there has been any further evidence on destruction versus loss. But he discovered the recording was no longer extant, which is all we know today. Well, he did testify that he did not intentionally destroy it, but did not know where it was. Correct. And the record, in any... Jimerson did not learn any further information on the status of the recording after January 2014. He also learns that the informant's lawyer discussed, or the sheriff believed the informant discussed, the death penalty with Mr. Vaughn. And they learned of the nondisclosure at this time, where it was available to them in the state court record, the district found, because there were discovery requests on this issue. They were fairly pointed. And the answer came back that no informants were used and no offers were made. And so while my friend has argued that they couldn't have known about the nondisclosure until they got an affidavit from trial counsel one year later, the district court rejected that. So what's left that they did not know as of January 2014 is that Mr. Vaughn may have said to Mr. Prescott that a girlfriend was the driver, and that Mr. Prescott was told that a murder occurred. But even as to that fact, that was learned one year and six days before the habeas petition was filed on June 24th, 2014. Ms. Daniels notes of her conversation with Prescott at, I think it's Appendix 459, say, I talked to Prescott and he said he knew about this and I presume that he's saying that he knew about the murder before he went in. So the only fact that's discovered outside or within, rather, the one year is that Vaughn may have referred to the driver as a girlfriend in his conversation with Prescott. The district court said that Jimerson needed that fact in order to plead a Brady claim and that was what transformed this evidence into useful impeachment evidence. And without it, she just couldn't plead any claim. Yet, when he decides the claim on the merits and grants relief, he does not even talk about that fact and he rather says that had the jury only known that Vaughn was targeted with an informant, then the jury would have discredited the confession. So while this fact may have added some color to the claim, maybe some strength to the claim, the claim could have been brought within a year of the conversation between Mr. Stinis and Sheriff Ford. But at the time he talks to the sheriff, he doesn't have a name of an informant and doesn't know what the informant got from him. So there's no, at least as to Jimerson, there's just no reference to a woman at all, correct? To her involvement, that this particular informant would have affected the case as to her. No, I don't follow the inference between the lack of the informant's name and how it would have affected the case as to her. I do think that while they didn't know the informant's name, they knew that a confession was made to the informant in which the several co-defendants were mentioned. And so while we don't see any impact on Jimerson's case. You think Jimerson could have filed a complaint the very next day? Could have filed her 2254 and that would have been sufficient? Yes, and we don't think that it would be subject to summary dismissal because the sheriff can't remember the name of the informant. I don't think that we could have said, you haven't completed this with particularity, therefore the petition must be tossed. Rather, I think they would be entitled to discovery on who this informant was and they would have found him. And indeed, they did find a document containing the name of the informant in February and it's not clear to me why it took them four months to figure out that Prescott was that informant. They were able to figure that out from the documents that they got in February, 16 months before they filed. Now, as to the Youngblood claim, they do have a superficially, I think, stronger case for untimeliness because there at least the district court points to one fact discovered within the one-year window that he does rely on in the merits. This being the omission of the fact that Prescott was working for the state in his sworn statement, which they did not get until several months before they filed. And from this, the district court says you can draw an inference of bad faith and that goes to the motive in destroying or losing the recording. We think that the much stronger evidence of bad faith, speaking relatively, of course, is the nondisclosure of the recording. The fact that Prescott's informant status wasn't mentioned in the statement, which wasn't disclosed to defense, doesn't really support bad faith very much at all, especially when you consider that what we're supposedly talking about being exculpatory is the recording, yet the contents of the recording are all documented in that statement. What's omitted from the statement are facts outside the recording. So we don't see how an evidence of the police's knowledge of the exculpatory value of the recording can be drawn from the omission of other facts in the statement that wouldn't be on the recording when they're in fact documenting the recording. So you're saying that the handwritten statement? Yes. Your position is that that contained everything that was in the recording? Yes. How do we know that? We don't know that, but what they are pointing to that they say makes their claim timely is the discovery of the omission of Prescott's informant status, which of course wouldn't have been disclosed to Brown in their conversations that were recorded from the statement. That might support an inference of bad faith about the police's use of an informant, but I can't see the contents of the recording. But if you're trying to avoid the defense learning that there's a recording, one reason may be because there's something in that recording that is exculpatory in the way that that confession was obtained from Mr. Vaughn. Isn't that at least an inference of bad faith by what was omitted from that statement? In other words, hiding the recording hides more than just police involvement. It hides the substance of the recordings themselves. Yes, but I think they get that inference of bad faith for timeliness purposes simply from the nondisclosure of the recording. I'm not seeing what more they get. You think that the just, the not, turning over the recording itself would be sufficient in your mind for a court to find bad faith? It seems to me you've got to have something that you can infer that there was something shady going on, something purposeful, and just a simple nondisclosure, that's Brady, right? That's not Youngblood. They have the fact that the recording is not disclosed. They have the fact in January of 2014 that the sheriff says we were told by prosecutors that we couldn't use the recording, and then they don't turn the recording over. Now you have this statement, documented by the way, before Vaughn's lawyer, who's present, and the statement isn't even turned over to defense counsel. I don't follow how an inference can be drawn about bad faith from a document that itself remains internal and actually documents the contents of the conversation and omits facts that aren't present on the recording. So for those reasons, we think that the Youngblood claim was untimely as well. If the court doesn't have questions about actual innocence, I'm happy to address actual innocence, which I think is an alternative ground in this case to affirm, because the district court below rejected actual innocence, not even getting into the credibility of Early's confession, but simply saying that it's insufficient to outweigh all the other evidence in the case to say that no juror would have voted to convict in light of it. If the court doesn't have questions about actual innocence, I'll turn to Merritt. So the Brady claim here is that had the jury known of this earlier confession by Vaughn to Prescott, and that it was enticed through the use of an informant, they then would have lost credibility of the later guilty plea that Vaughn made. And we think that suffers from at least two fallacies. The first is that evidence of an earlier confession that seems to buttress the veracity of the later confession made in court could somehow ever help them. And the second is that there's some necessary inference that one draws when an informant is used, that an informant has a tendency to cause people to make things up and testify falsely in order to avoid greater sentences. So we think that both of those are wrong. Now, on the earlier confession, at trial, Jimerson and Brown presented a coherent enough theory. Jimerson said that he did not want to be executed. He said that his lawyer convinced him he should plead guilty. He mentioned his lawyer in his recantation testimony by name approximately 27 times and said that Mr. Remit, his counsel, had him all confused. And that was a coherent enough theory that he would plead guilty, take a deal, in order to not be executed. Now, if they introduced this confession to Prescott, they would have to explain why Vaughn is not only confessing to the court and to prosecution and thereby getting a lower sentence, but why he's confessing to an apparently disinterested third party in prison who stages a fight with police to appear as independent from them as possible. And part of that would be what that informant came to Mr. Vaughn with, right, and what that conversation was. And I understand, I think it's undisputed that Mr. Vaughn had some cognitive limitations. So I think maybe it oversimplifies it to say that it's a prior confession. I think what the appellees are saying, it was the creation of that confession, right? How did that come about? I can understand the theory that Prescott could induce Vaughn, could persuade Vaughn theoretically to make a guilty plea. That's at least conceptually possible. What doesn't make sense is Vaughn confessing to his cellmate, saying that he did all these things, and then because he's scared of being executed. Prescott cannot lower his sentence. Prescott, as far as he knows, can't do anything for him. But I guess to interject there, we don't know what Prescott said. So actually Prescott was called as a witness by Jimerson at her evidentiary hearing, as a friendly witness. And Prescott said quite a lot about these conversations. Did he remember most of it? Or did he say one way or another how much of that conversation over the course of those several days he recalled? He doesn't say that he has a perfect recollection. For instance, he is not sure that Vaughn actually called Jimerson a girlfriend. But he does recall quite a bit. And what he said was that they talked for about 30 minutes to an hour a day, that sometimes Vaughn would bring the topic of his own alleged crimes up to him. Sometimes Prescott would start the conversation. He says that he doesn't actually believe that he mentioned the death penalty that he might have in an effort to get Vaughn to start talking. But he does not recall in any way a very coercive or aggressive set of questions on his part. The interaction between them seems to have been fairly non-directional. But even if it were more aggressive than he testifies on Jimerson's behalf, it still strains credulity that he could extract, not only extract a testimony, but extract evidence. And that would tend to undermine the jury's already weak credence. What was the record or the evidence that was presented at the hearing on how much Mr. Prescott knew about the crime before he went in or as he was talking to Vaughn that he got from someplace else, presumably the sheriff? My understanding of the testimony is very little. He was told that an old woman was murdered. He said that that bothered him and that he wanted to help the police investigate this crime. But he was not told about a woman. In fact, Jimerson had not been arrested until Vaughn mentioned her. He wasn't told specifics. He wasn't told. He may have been told how many people had been arrested at this point, three. But beyond that, I don't think that he is given many details. And yet in spite of that, what he gets according to his sworn statement, according to his testimony below is a pretty detailed confession that then is repeated largely verbatim in Vaughn's plea colloquy only to be retracted in recantation testimony where Vaughn says he doesn't even know any of these people. That being said, even if we could set aside the fact that Vaughn actually confesses to Prescott, it's very hard to understand how this extra piece of evidence that a person mentioned the death penalty in conversations with Vaughn would tip the balance and cause the jury to think that this confession was not true. Vaughn testified, perhaps not in great detail, but very insistently, that his lawyer warned him of the death penalty, scared him about this possible sentence. He knew that he was indicted for capital murder before he ever talked to Prescott. And that it was his lawyer, he said 27 times, who caused him to make this confession. And he then said at the end of his testimony under questioning, admittedly leading questioning, that there were two other people who mentioned the death penalty to him who worked for police or prosecutors. And so if you add a fourth person who perhaps has the least ability to influence, and not his lawyer, not a prosecutor, not a representative of the police, but a cellmate who's telling him, you know, you've been indicted for capital murder, that means that you could be executed. We can't understand the inference that the jury then would have thought, well, that influence was probably what caused this false confession. Now, that is the first time, however, that Jimerson is named at all, correct? Correct. So is the state's position different as to the impact for Brown as it is to Jimerson? I think, if anything, we may have a stronger case as to Jimerson, because Prescott is not sent in with information about Jimerson or even about any woman, and yet what happens is that Vaughn mentions that there's a woman who's a driver, and then in his plea, he names her. Now, the girlfriend fact is perhaps the only colorably exculpatory piece of evidence in this whole business with Prescott that we can see, but that cannot possibly get you to a reasonable probability of acquittal for a whole lot of reasons. So first, Prescott has a very uncertain recollection of whether Vaughn called this woman a girlfriend. At one point, he even says, I presume that she was a girlfriend because one would imagine that such a person who's driving people around to commit a crime like this must have a close relationship with these people. Second, Vaughn could be confused about whether this woman was a girlfriend of these people. Third, she could actually have, in fact, been a girlfriend, though she testifies that she wasn't. There is testimony in the record below that there were at least romantic overtures made to Jimerson by some of these co-defendants. So I don't see how introducing Prescott's uncertain recollection that Vaughn called the driver a girlfriend could cause the jury to say, well, it couldn't have been her because, in fact, she's not a girlfriend of any of these people. And Vaughn has not testified, correct, in these hearings? I think that Vaughn testified briefly below. In the evidentiary hearing? Correct, yes. And that testimony is not useful for either side? I think that's a fair characterization of that testimony. If I could then turn to the Youngblood claim where we acknowledge a somewhat lesser showing of materiality is required, though this court's precedent holds you still need a showing of materiality, we think perhaps the easiest way to decide that claim is that there's a total one of evidence in the record as to when this recording was lost or destroyed, and it's an element of the claim that it must be lost or destroyed pretrial, or otherwise there is no due process violation. And there's also a total one of evidence in the record about whether it was destroyed, lost, merely negligently lost, and the negligent loss doesn't get you to a Youngblood claim. And then for the reasons I've discussed, we don't think that these recordings of an extra confession that Vaughn makes to a disinterested party would at all be helpful to them. And, in fact, we can't imagine that they would have wanted to play this recording at trial. We think prosecution would have used it had they not been under the belief that it was inadmissible because of the Sixth Amendment problem with Vaughn. Lastly, if I could before I use up all my rebuttal, address the separate timeliness problem in Brown's case. I think that the timeliness dispute between the parties comes down to how we read Ingram, where this court held that a prisoner was untimely because he failed to discover a federal sentencing commission's report that contained certain facts about geographical disparities in certain mandatory minimum sentences. My friend, Ms. Bushnell, has tried to distinguish that case in two ways. First, she says that it would have been even harder for Brown to see Jimmerson's habeas petition than it would be for Ingram to find a sentencing commission's report while in prison. I don't know about the accessibility of sentencing commission reports while in prison, but here we have abundant evidence in the record proffered by Brown himself that he could have accessed the habeas petition by talking to Jimmerson through his cousin, who was in correspondence with Jimmerson. Jimmerson wrote back. Isn't it really the difference between monitoring your own case and monitoring someone else's case? I think that when... Wouldn't we be stretching Ingram if we went the direction you wanted us to go? So I don't know that reading sentencing commission reports that provide generalized data about disparities in the country is monitoring your own case, but even accepting that characterization, I think that when somebody is tried with several defendants on the same evidence, the very best possible source of information that they could look to for facts supporting any habeas petition they might bring is ones that their co-defendants have brought, much better than a sentencing commission report, much better than an Ana Lua Lopez checking your appellate docket when your lawyer has already told you that I filed a direct appeal, and certainly no lawyer would ever neglect to look at these pleadings if he were trying to help Brown, and we think that rather minimal duty of diligence falls on Brown when there's no real dispute that he could have gotten this petition through his cousin, who he offered below as evidence of his diligence, her efforts on his behalf. So if there are no further questions, I'll reserve the balance of my time for rebuttal. Very well. May it please the court. My name is Andrea Lewis, and I, along with my co-counsel Karen Daniel, represent appellee Tina Jemerson, and the district court properly awarded Ms. Jemerson relief on her Brady and Youngblood claims where the state lied about and, in fact, destroyed evidence in her case, and the part where the state did not present this evidence and the part about the evidence  So here, Sheriff Donnie Ford sent informant Ronnie Prescott into a jail cell with Charlie Vaughn, who at the time was represented by counsel and who showed signs of having mental defect. Prescott was armed with a hidden tape recorder and a promise from Donnie Ford that if Prescott got Vaughn to talk about the murder, Prescott's pending drug charges would go away. Prescott then recorded three or four conversations with Charlie Vaughn and ultimately, allegedly recorded a conversation in which Charlie Vaughn confessed to participating in the murder of Myrtle Holmes, in which he implicated Ms. Jemerson as the getaway driver. After Ford listened to the tape, he took the tape recorder from Prescott, and he called the prosecuting attorney. Now, we know there must have been something exculpatory to Ms. Jemerson on that tape based on the behavior of law enforcement and based on the behavior from the state's attorney from there. When Ford spoke to the prosecuting attorney and the two determined that the prosecution could not use the recording, the recording disappeared. They don't surface anywhere else in this case. Law enforcement then staged a do-over of Charlie Vaughn's confession, this time with his attorney present and this time mentioning nothing about Ronnie Prescott's role in the case. Law enforcement also drafted for Prescott a statement for Prescott's signature, which also omits any mention of recordings between Prescott and Vaughn and omits information about Prescott's role as an incentivized informant in this case. After that, again, even Ronnie Prescott disappears from Ms. Jemerson's case as Ms. Jemerson was arrested based on Charlie Vaughn's confession. And now an innocent woman was facing murder charges. Her attorney issued discovery requests specifically asking about informants used in the case, specifically requesting any recordings taken from witnesses, and specifically requesting information on inducements made to witnesses and informants. Maybe I should know this from the record, but did Vaughn's lawyer know about Prescott at the time? Vaughn's lawyer, from what I understand, knew that Prescott alleged that Vaughn had made a confession to him. There's nothing on the record suggesting that Vaughn's attorney knew that Prescott was an Now, again, the prosecution denied the existence of any informant. The prosecution did not turn over any of the tapes that were taken from Ronnie Prescott, and the prosecution denied that there were any inducements made to any witnesses or informants in the case. Twenty-two years later, after Ms. Jemerson did discover the informant information and the state opted to stand on procedural bars that it created to attempt to deny Ms. Jemerson any relief in court. So why wasn't there enough known by January of 2014? In January of 2014, the only thing that Ms. Jemerson knew was that an informant, an unknown informant or an unknown person, had spoken to Charlie Vaughn and taped a conversation. That information didn't tell Ms. Jemerson the contents of their conversations, so she didn't know if any evidence might have been favorable to her. That information didn't tell Ms. Jemerson that the information was certainly suppressed from her. She couldn't know that until she spoke to her attorney, and additionally, Ms. Jemerson didn't have the identity of the informant, and without having that information, again, she couldn't confirm what the informant had spoken to Charlie Vaughn about in the first place. Well, surely she would have known that at least her lawyer didn't tell her that no one told her that there had been this informant who had gotten the confession. She would have known that, right? Even if that was the case, again, the information would have had to be favorable to her and it would have had to be expulsory, and she had no idea what it is that took place between the informant and Charlie Vaughn without speaking to the informant. Well, Mr. Steinberg said she knew that he was incentivized, is that right? That is incorrect, without speaking to the informant. She had to figure out who he was and check into his case to see whether his case had actually been... So the sheriff didn't disclose to the investigator that there was an incentive? Correct. Well, the sheriff told him that he'd, from what I recall, that he'd see what he could do about his pending drug charge, and again, that still leaves us with not knowing whether there was any favorable information exchanged between the informant. But I think your whole argument is that having an incentivized informant coerce Mr. Vaughn, who's susceptible, that fact in and of itself is favorable, right? Isn't that your materiality argument? No, that's part of our materiality argument, but the informant we later discovered also elicited information that the getaway driver was one of the co-defendant's girlfriends, and that was a piece of information that Ms. Jemerson did not know ahead of time, and we also knew that the informant had information about the murder before speaking to Charlie Vaughn, which would have explained how Charlie Vaughn would have been able to give at least some information about how this crime occurred if he wasn't there. Does she have to know all the details, or does she have to know just enough that this undisclosed information would have been favorable to her? She has to have enough information to survive summary dismissal, and that information needed to be all of the vital facts of her claim. And for Brady... Wait a minute, wait, those are two different things, right? Surviving summary dismissal is different than knowing all the details relevant to your claim, right? Well, not all the details relevant, but she had to plead the vital facts of her claim in order to survive dismissal of her case. Okay, and so I guess my question is, why isn't it enough to know that you have an incentivized informant who solicited a confession, and that that wasn't disclosed to you from someone you know to be, you know, to not have full capabilities? In that case, all Ms. Jemerson would have had was that an informant elicited a second or I guess a first confession from an informant. Again, the information had to be favorable to her and material to her case. Well, you're arguing now that that is, right? I'm arguing that's part of it, but again, Ms. Jemerson, from the informant, gathered that there was a case of mistaken identity as far as she knew then, because Reginald Shirley had not yet confessed, and she could have argued that she was not, in fact, the woman who had driven the getaway car, and she also could have explained why Charlie Bond would have falsely confessed. Is Mr. Steinberg correct that that fact wasn't even put in the claim for relief? No, he's incorrect in that fact, and he's also incorrect that the district court did not address it. In the addendum at page 10, the district court did, in fact, address the girlfriend piece was part of the exculpatory evidence against Ms. Jemerson. If you go forward to June of 2014, that's when counsel first talked to Prescott, right? That's when counsel had a phone conversation with Mr. Prescott, correct? So tell me why Ms. Jemerson wouldn't have enough information at least by then, because if I understand correctly, Prescott does say there was a girl at that point in that conversation. He confirms who he is, gets the information about what had happened. Why isn't that the deadline, the time at which Tina Jemerson would have had all of the information for that Brady claim? Even if Mr. Prescott said there was a girl, Tina is a girl, it wasn't until July 11, 2014, during the in-person visit that Prescott revealed that what Vaughn had actually said was that it was a girlfriend. But on a more practical note, having a brief phone conversation with an unknown party on the other end of the phone, that's not evidence. I mean, that's the reason that often in state post-conviction proceedings, allegations have to be supported by affidavit until my colleague, Ms. Daniel, could speak to Mr. Prescott in person and assess what exactly he had spoken to Charlie Vaughn about, or at least what he recollected speaking to Charlie Vaughn about two decades prior, Ms. Jemerson did not have enough information to fulfill counsel's obligations under Rule 11 of the Civil Procedure. So in your experience, you don't put forth an attorney affidavit or anything like that? You can't just say, counsel has spoken with this particular witness and here's what he has said. That's not sufficient in your views under the rules and procedures for presenting the claim? In my experience, that's correct. What we would have needed was that affidavit from the informant himself who was willing to come forward and share the knowledge that he had in the case. So I'd like to turn to the merits of Ms. Jemerson's timely filed Brady claim. In this case, as I mentioned, the state suppressed evidence of the informant. That's not in dispute. As I mentioned, the favorable evidence was the portion where a girlfriend of the co-defendant drove Ms. Jemerson and also without the informant information, Ms. Jemerson could not sufficiently explain why Charlie Vaughn would have confessed to a crime and then recanted at trial later. The circumstances of the conversation that he had with Rodney Prescott were important in that way and they were essential to her case. To that extent, we believe Ms. Jemerson met all of the requirements of Brady and that evidence was suppressed that it was favorable to her and that it was material to her case. Could you articulate to me why a prior confession that's consistent with the subsequent guilty plea and fairly detailed, I gather, why is that likely to result, albeit from an incentivized informant and all, why is that likely to result in a different outcome? The confession was the piece of evidence that led to Ms. Jemerson's arrest and it's what caused Ms. Jemerson to be convicted. There was other circumstantial evidence, but that evidence, as the district court noted, had credibility issues. The confession really was key to Ms. Jemerson's conviction. In a case where the individual who confessed then recanted at trial, it would have been critical for Ms. Jemerson to explain why Charlie Vaughn would have been able to be coerced into saying that he did something he didn't do and why he would have been able to be coerced into implicating other individuals who were not involved. With that, Ms. Jemerson would have undermined the credibility of the state's case and, in addition, she would have been able to impeach police officers who had testified that Charlie Vaughn had just made one single confession and the state's entire case would have crumbled from there and she would have been found not guilty, having no credible confession. And again, that confession was the only piece of direct evidence against Ms. Jemerson in this case. So if there are no other questions on that, Ms. Jemerson posits that because she was able to show the merits of her Brady claim and because the state suppressed the evidence from her, she did meet the cause and prejudice test to overcome her procedure of default. To move on to her Youngblood claim, she also has a meritorious claim there that excuses any defaults she might have had. Here, the evidence certainly was potentially useful to her. The informant could have said anything, as Your Honor noted, the informant could have, in fact, threatened Charlie Vaughn. He could have said, hey, if you confess, you won't get the death penalty, but we don't know because the state destroyed the evidence. Is there any evidence that the tape was destroyed before the trial? Yes, I think that's a reasonable inference. If you look at the record, Ms. Jemerson's attorney made discovery requests requesting a tape 14 days after Ms. Jemerson was charged with this crime. The state responded and said that the only recordings in this case were from two other witnesses, Kenny and Lee Parsons. If there's any truth to that, then the tape no longer existed within the amount of time that the state had to answer the discovery request. But in addition, we have the circumstances that also lead us to make a bad faith determination in this case. For one thing, there was the do-over of Charlie Vaughn's confession that didn't mention the recordings at all. There was the statement that Ronnie Prescott signed but said he did not write and could not read and contain names that he did not have that also omitted any mention of the tape. And then you have the one-page police report in which Ronnie Prescott is mentioned as being someone who owned a business and who was interviewed in the case but didn't mention any tapes. This tape doesn't surface at any point before trial despite requests and despite there being other documents taken before trial. So I think the only reasonable explanation is that the tape was destroyed before trial. And these same circumstances go to the bad faith element of Ms. Jemerson's claim. And if there are no other questions there, I just wanted to note that Ms. Jemerson does also have an actual innocent claim that cannot be reconciled with the decision below in Mr. Brown's case which rested on Mr. Early's confession and credibility. And if Ms. Jemerson can show sufficient evidence to pass through the gateway of Schlup versus Zello, then that overcomes all of this. It overcomes timeliness. It overcomes diligence that the state is arguing and the state must find in her favor. And I just want to end by responding to some of the state's points on exhaustion. First, the state affirmatively waived any exhaustion defense. And to the extent that the state says they did not, what they did was wrap it up in procedural default. Rule 5B of the habeas rules requires that a respondent address procedural default and exhaustion along with statute of limitations and nonretroactivity. Here the state chose to raise two defenses, statute of limitations they raised in their response and they also raised procedural default. So that shows that the attorney general sat down, looked at the case, assessed what defenses the attorney general could raise, and raised the ones that the attorney general intended to raise and did not raise exhaustion because they did not mean to. And Ms. Jemerson did, in fact, exhaust all of her claims. Quorum nobis, as the Arkansas Supreme Court has said numerous times, is an extraordinary remedy. It is not within the standard review process as contemplated by the Supreme Court. And so she did, in fact, exhaust those remedies. Even if she had been able to file quorum nobis, that only would have applied to her Brady claim. The Arkansas Supreme Court has, again, in Pitts v. State and other cases, said that quorum nobis is an exceedingly narrow remedy. They've declined numerous times to extend it to any other circumstances. And Youngblood v. Arizona or destruction of potentially useful evidence in bad faith has not been one of the circumstances that have been accepted as a quorum nobis petition by the Arkansas Supreme Court. The state has acknowledged that Ms. Jemerson's actual innocence claim is not covered by quorum Jemerson's claim. That makes this claim, at worst, a mixed petition. And with the innocence claim, the court can continue to review Ms. Jemerson's claim. And again, non-exhaustion, even if Ms. Jemerson had not exhausted, does not deprive jurisdiction in this court. Ms. Jemerson has two claims that were meritorious below, her Youngblood claim and her Brady claim. They won on their merit. And this court may affirm, regardless of the court's findings on that matter. And so for that reason, I ask that this court affirm Ms. Jemerson's grant of habeas relief. And in the alternative, I ask that this court grant relief still based on Ms. Jemerson's actual innocence claim. And I will cede the rest of the time to Ms. Bushnell. Thank you, Ms. Lewis. Ms. Bushnell. Good morning, Your Honors. May it please the court. My name is Tricia Bushnell, and I here represent Mr. John Brown, Jr., before this court. This case presents the rare instance in which an innocent person was convicted of a crime they did not commit. In 1992, Mr. Brown, with his co-defendant Tina Jemerson, was convicted of the murder of Myrtle Holmes based solely on two threads of evidence. The first being the immediately recanted confession of an intellectually disabled co-defendant, Charlie Vaughn. And the second being a number of pieces of evidence used by now known to be incentivized individuals testifying that the co-defendants knew each other. All of these have been shown to be unreliable through the discovery of previously suppressed evidence. The first, Ronnie Prescott, the use of Ronnie Prescott as an informant in this case was never disclosed. The fact that he received a deal in exchange for securing the testimony from Mr. Vaughn was never disclosed. In such that Mr. Prescott even testified in his subsequent sentencing hearing that he got them all they wanted and more. The fact that he had a handwritten, supposed handwritten statement that he himself admitted he could not have written because he did not read or write at the time was never disclosed. The fact that he had made a recording of his conversations with Charlie Vaughn was never disclosed. And the fact that those recordings were not even put into the statement that was written for him. The fact that that recording was destroyed and never turned over was never disclosed. In addition, Chief Poole and Lieutenant Bradshaw, two law enforcement agents testified at court, they left the impression that Vaughn had confessed voluntarily, that it had all come forward even though the state knew at that time that Ronnie Prescott had been the only individual that had a conversation with which then Charlie Vaughn came forward for three years. This is a case, the crime that occurred in 1988 that went unsolved for years. It was incredibly difficult experience for the community. That's why they brought in the investigator Michael Joe Early. Throughout that entire time, Charlie Vaughn had denied any involvement. They requested a sample of his blood to compare to the DNA that was taken that later excluded Mr. Vaughn. Mr. Vaughn was so terrified of the police at that time, they had to actually hold him down to get the blood from him. And how many officers testified at their first trial? You referenced the officers stating or indicating or suggesting, implying that it was only the first confession. How many were there? I apologize. I don't know the total number of officers, but these were the only two that discussed the conversations with Charlie Vaughn and his statement. In addition, we now know that the other pieces of evidence, the other threads occurred through different incentives that were not previously disclosed. The state also failed to disclose evidence about the Parsons, who were two individuals who testified that Mr. Brown had come to their house, had worn bloody clothes, and had been seen with other individuals. We now know that Mr. Parsons were in and out of jail at the time, even though the state had replied and said they knew of no former convictions of any of the other witnesses. They were in and out of jail. They had significant drug abuse. Kenny Parsons had been in and out of a state institution for mental health problems, and their father was the head of the jail trustee program at that time, which, again, went previously undisclosed. And with all evidence that a defense attorney could use to impeach their testimony, the Parsons had actually given a statement three months after the crime, much closer in time, in which they stated they knew nothing about the case. They knew nothing. They did not have any information. It wasn't until the trial came, now three and a half years later, that they suddenly come forward when they are released on this jail trustee program. In addition, Tora Bryant, who is the other individual who is used to bring the defendants together and testifies that the co-defendants had been seen together at a party, she had been used as an informant, and had not been disclosed. Her previous name was gone by Sam. In what we now know is that Tora Bryant had a very close familial relationship with Investigator Michael Joe Early that, again, was never disclosed. And in his testimony in the hearing below, Mr. Early said he never used her before. He never used her again. But Ms. Bryant, who he described as suffering from drug addiction and having multiple problems with law enforcement, when it was disclosed that she was an informant, it was signed by her brother. Her brother that Mr. Early had taken in and raised on his own after the death of their father. There were subsequent Facebook posts and things that were disclosed at the hearing below that this familial relationship existed at that time, and it existed for years. And none of that was disclosed. In essence, this is a case where every piece of evidence used to convict Mr. Brown and to connect him to the crime was subject to some sort of suppression or evidence incentive that the state used that was not revealed. And it's for all of those reasons that it can be described as a case built on a house of cards. And in instances like this, where the evidence is already weak, any of this makes a difference, especially when considered cumulatively, which is what the court is required to do in looking at an instance of a Brady claim. In fact, this case had two trials. At the first trial, the jury hung 6-6, and that was based looking at the immediately recanted confession of Charlie Vaughn at that time without additional information about the creation of this statement, this inculpatory statement from Mr. Vaughn that literally existed for 24 hours. Mr. Vaughn has a statement with Ronnie Prescott that goes undisclosed. They come. They bring counsel. They take his plea within that 24 hours. He never again says that he did it. And hearing that, the jury found 6-6 that they could not reach a decision. Now, taking into account a properly instructed jury, if they heard all of the evidence and removed the evidence that was created by Brady misconduct, would certainly find these defendants not guilty and that they were actually innocent. In Schlup itself, the standard for actual innocence is not that this court must decide to a degree of all certainty whether or not someone did it. You think the analysis is to remove the evidence that was created by the Brady misconduct? Even if it was to be just to be taken in light of, certainly the court, a jury, a properly instructed jury would have significant doubt as to the reliability of any of these witnesses, in particular, Mr. Vaughn, who is the only witness who puts any of our clients at the crime scene. And in fact, DNA evidence... I wonder, as a matter of strategy, having many years ago done a little criminal defense, if really a criminal defense lawyer would try to make sure that that first confession never saw the light of day, because it's probably a Sixth Amendment violation, right? Well, it certainly is a Sixth Amendment violation, but that would only be a constitutional right that Charlie Vaughn himself could raise. That is not something that would have been at issue in Tina Jemison's and Mr. Brown's case. And in fact, does not remove the state's obligation to disclose the evidence that it had obtained in violation. Even if that's not true, it's still the prior consistent statement. I wonder if a criminal defense lawyer would really want it out. Well, for the first part, no criminal defense lawyer could have made that determination because it was never disclosed. I agree with that. But it certainly, and what we now know from confession cases, false confession cases around the country, is the creation, the circumstances surrounding how that confession comes forward are critical. And it was critical here. Charlie Vaughn denied ever having a part and role in this case. And some of the details that he provides are factually incorrect. He testifies that they went in through a window. There's no evidence at all to suggest that they went in through a window. He makes up reasons about why they stopped at this individual's home, and he says he doesn't know. All are things that Mr. Early provided credible testimony for. In addition, he doesn't even know the weapons that were used. You can see in his exchange with the court, where the court even tells him, I'm not trying to put words in your mouth. I'm just trying to see what happened. He says, well, he used a pipe. Oh, no, not a pipe. Was it a skillet? Yes, it's a skillet. All of that information, even if it's considered a prior consistent statement, it's the circumstances of it. It's the information, the details in which he gets wrong that another defendant would certainly want to use. I can't speak to what Mr. Vaughn's counsel would want to use, but Mr. Brown's would. And in fact, his counsel testified at the hearing below that had he had this statement, had he had this information, had he had the information about Ronnie Prescott, he would have used that to impeach the testimony. Testimony that the first jury already doubted when they could not reach a decision at six to six. And most importantly, Charlie Vaughn's testimony was that all three of the male co-defendants sexually assaulted the victim in this case. But DNA shows that's not true. In fact, Charlie Vaughn and John Brown were both excluded at the time of trial as contributors to that DNA evidence. So even by his own testimony, we know from DNA that it couldn't be the case. Unfortunately, that DNA evidence was not presented at the second trial, and the jury was not able to hear that. And part of that is because the state dropped the rape charge in the second trial, and so that evidence did not come in. But in a SHLOOP analysis, an actual innocence analysis, that is something that this court must consider, what that DNA evidence combined with the new information about Ronnie Prescott and the information about all of the other impeachment evidence of the other witnesses comes to bear. And as we heard from Reverend Early, the one witness who, there were two witnesses that had no incentives provided, Patsy Harris, who was the court clerk, and Daryl Jenkins, who Reginald Early admits he confessed to, and he, in his testimony, was the only individual who discussed them being at the crime scene who told the truth. Because Daryl Jenkins did not say that Reginald Early confessed to having done it with any other individual, and that he said he immediately went to Mr. Jenkins and told the truth. In that regard, this is a case where everything was always tenuous, and looking at it in cumulation, this court should find that Mr. Brown is actually innocent. In addition, the standard of review here is incredibly high on an actual innocence claim. In the Amrine case, this court has found that it's basically unreviewable and must look for absolute clear error in a finding of actual innocence. And in its attempt to argue that Mr. Brown should not be able to overcome this case, in which it is layered upon layer of state misconduct, the attorney general has argued that Mr. Brown was not diligent in making this finding. That is certainly something that the district court was troubled by below, where in a case like here, where the state has suppressed evidence, that it could then use the fact that evidence was not found sooner as a reason to bar a defendant from relief. And that is simply not the case, nor has this or the United States Supreme Court held that. In fact, it has always found that it is not that a prosecutor may hide and that a defendant must seek. It is what a defendant is on notice to find. And here, Mr. Brown was not on any notice until he was at Ms. Jimmerson's hearing. And in fact, Mr. Brown himself was not even in the courtroom when the evidence around any of the other witnesses came out about the Youngblood claim or Reginald Early's confession. That was the first time he had counsel and was the first time that he had ever been put on notice to be looking for these claims. And he filed within a year of that and within a year of Reginald Early's confession. The state looks to Ingram and Anjula Lopez as the arguments for why Mr. Brown should have been on notice before. But those are distinctly different cases and should be distinguished. First, in Mr. Ingram's case, which was before this court, Mr. Ingram, at his time of sentencing, was told by the trial court there certainly seemed to be different disparities and racial disparities in this case and was troubled by them and thought that there may even have been a potential claim there. Putting Mr. Ingram on notice that he should be looking for the evidence that would support a claim that the court had already indicated it was troubled about. Now, Mr. Ingram did not do that. He did not file to the only mechanism that exists, the only body that makes that information available, which is the Sentencing Commission. Instead, he waited until the decision in the younger case. But even then, he did not even file within a year of the younger case coming out. So by any measure, Mr. Ingram was not timely for something that he should have been on notice of since his sentencing and then certainly even when he found about it in the court. Now, in regards to Mr. Anjula Lopez, Mr. Anjula Lopez believed that his attorney had filed a case on his behalf, right? But he did not check his own docket until well after a year to know, oh my gosh, no one ever filed for me. But the U.S. Supreme Court and this court have always imputed the actions of a defendant's attorney to that defendant himself. What it does not impute is the action of a co-defendant's attorney to that defendant. We know as counsel that we are obligated. When we were put on notice, we were obligated to make that filing for Mr. Brown. But Mr. Brown was not obligated to do, quite frankly, what we don't even know is possible, to start checking dockets. And we don't even know what courts. The various courts are different, state courts, federal courts. Some require that you look where someone is being held. Some require that you look where the person was convicted. There are four co-defendants in this case. It was 26 years. We don't even know that he would have access to the mechanisms to do that. And in fact, the state... What about the argument I heard this morning about some cousin being willing to do that kind of thing for him? Ms. Latifa did not testify that that's what she was willing to do. What she did testify is that she tried to get him counsel multiple times, that she wrote different innocence organizations, that she contacted various attorneys. She herself is not an attorney, and the court has not held that we impute the actions of just a relative to a defendant. It's always their counsel. So certainly, that was not what was in the record below, that she would even have the knowledge of how to do that. And quite frankly, they weren't even in touch at that time. They'd been in touch at various times, and that was in the record below, that he hadn't spoken to her in some time. So in those regards, Mr. Brown was always diligent. As soon as this information came to light, he had counsel, additional investigation was done that showed additional suppressed evidence by the state. And the U.S. Supreme Court has held in Cohn v. Bell that even if there are mechanisms that should have been taken in a state procedure, or even if the state procedure itself had found that the defendant had not followed the state procedure correctly, where the state And that makes sense. We cannot have a system that says we can violate rights as much as we want, as long as you never find it. And if you do find it, that you should have found it before, and we'll just keep you from seeing it. That's not the point of it. And in this case, there were actually expressed letters or statements to the defense counsel that there wasn't anything, correct? Absolutely. And in fact, at the time below, Mr. Brown has never been put on notice that he was supposed to be doing any extraordinary measure by the attorney general, the very responsive party in a writ of quorum nobis. So if the attorney general thought that the writ of quorum nobis was something that needed to happen, that is the same party that responds in those measures and never said that. In fact, said the opposite, said that there was no non-futile, unexhausted non-futile state remedy available to Mr. Brown. And as to the attorney general's argument that he was technically exhausted, well, that is exhaustion. The U.S. Supreme Court in Coleman v. Thompson has said when no remedy is available, right, if you would have been out of time for everything, you are then procedurally defaulted. And those are the defenses that the attorney general raised below and that Mr. Brown has always argued that he overcome by both cause and prejudice with his Brady and his Brady line of cases claims and actual innocence. But even if this court were to find that this rather unclear process, the extraordinary remedy, which has never been required as a part of exhausting a claim, but certainly it is also unclear as to what the standards even are. We have questions today as what is the standard that the Arkansas Supreme Court looks at in its gatekeeping function when it remands back down versus the standard of the merits. The courts have held that where it is unclear, it cannot have been required for exhaustion because it is very similar to Reed v. Ross where something was so novel, so new, we could not say that a defendant was unnoticed to do it. And certainly that is what happened here, particularly when the state by its own reasoning waived that claim. And again, articulated in the response in the supplemental briefing that there was nothing that Mr. Brown could have done. He could not have filed a quorum nobis even then by the Attorney General's very argument, leaving him procedurally defaulted. And Mr. Brown overcame those procedural defaults by both cause and prejudice and actual innocence. But regardless, actual innocence is the ultimate equity. It overcomes everything. This court has never found that leaving an innocent person in prison is something that we would stand for. And the court sitting in equity has that ability. And that is the history of habeas in itself. Certain parts of habeas came from the common law in equity and then were codified into various degrees. And you can see as the case law expands, when we look at 2254, when we look at post-EDPA case law, how we are making the determinations of those procedures now that it is codified. But even then, even in spite of all of that, the U.S. Supreme Court has always said actual innocence overcomes all of that procedural default. It overcomes the statute of limitation. It would overcome exhaustion. Granbury v. Greer also says that we should find things exhausted when there would be no reason to delay the outcome, which is keeping an innocent person from having to go back into prison. And if there are no further— Your actual innocence claim is based on the early confession, right? The actual innocence claim includes the early confession, but it also includes all of the other evidence. Because if you look, for example, at Mr. Schlup's case in Schlup v. Delo, they said that he was innocent because of the recantations of a number of individuals. But what's most notable is Mr. Schlup himself, two witnesses still stood by their testimony and the court found he was actually innocent. Here, there's nothing left that remains that ties Mr. Brown to the crime, not the confession, and not even the testimony that just says he associated with the other co-defendants that he in fact did not. Thank you. I think I have four points. On Jimmerson and timeliness, this would be a different case if her claim were just that Vaughn referred to the driver as a girlfriend. But in fact, they predicated their whole case on merely the use of the informant, and in fact, they say that's part of our materiality argument. So we think that they certainly could have brought that claim long before when they did within a year of talking to the sheriff. On Brown's timeliness arguments, they seem to be running away from the cousin who Brown introduced below as his means of diligence and his proof that he was diligent, that he was working through his cousin, talking to his co-defendants, getting court records from various courts to prove that he was diligent, and we don't think that they can now disavow her efforts as not his and not something that's chargeable to him. On Youngblood, what I heard as to the timing of the destruction is that we should believe the discovery response, its representation that there were no recordings, even though we know those discovery responses were false in other respects, and indeed, that's the whole predicate of their Brady and Youngblood claims. So we don't think they can have it both ways on the veracity of these discovery responses. And absent that, there's absolutely no evidence that this recording was destroyed pre-trial. And finally, on Brady, I did not hear an answer really on how the fact of this confession would have helped. It was said that Prescott was coercive, that it's somehow obvious that the use of this informant was coercive, and we think it would be helpful in this regard to look at the Supreme Court's Miranda jurisprudence, where they've held the use of informants are not coercive. You don't need to Mirandize people if you're using informants because there's, quote, no empirical basis for the assumption that they coerce people to confess. So if there are no further questions, we would like to ask the Court to reverse the grants of habeas relief below. Very well. Court would like to thank counsel. The arguments today were very, very well done, I thought, and helpful to the Court. A case will be submitted. There's a lot of moving parts, but we'll decide it in due course. The Court will stand in recess for 10 minutes.